IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| JAMES W. MCGLOTHLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 9:18-cv-00246-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| KEVIN N. HENNELLY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The following matter is before the court on plaintiff James W. McGlothlin's

("McGlothlin") motion for determination of dispositive motion deadline, ECF No. 60;

defendant Kevin N. Hennelly's ("Hennelly") motion for summary judgment, ECF No.

61; and McGlothlin's motion for partial summary judgment, ECF No. 62. For the

reasons set forth below, the court find as moot the motion for determination of a

dispositive motion deadline, grants Hennelly's motion for summary judgment, and denies

McGlothlin's motion for partial summary judgment.

## I.  BACKGROUND

This matter arises from Hennelly's alleged defamation of McGlothlin through a

Facebook post and a comment on a local newspaper's online article. Hennelly is a 65-

year-old man who lives with his wife in Bluffton, South Carolina. ECF No. 62-6,

Deposition of Kevin Hennelly ("Hennelly Depo.") 7:24–8:23. He is not currently

employed but previously worked in the utilities industry for 44 years. Hennelly Depo.

27:6–32:3. Hennelly is involved in his community as the treasurer of the Beaufort

County Republican Party and as an unpaid member of the Beaufort County Planning

Commission. Hennelly Depo. 22:18–20; 27:15–16.

Hennelly's allegedly defamatory statements arose out of a controversy around the attempted rezoning of Hilton Head National Golf Course ("Hilton Head National"), located in Beaufort County, South Carolina. Hilton Head National is owned by Scratch Golf, LLC ("Scratch Golf"), and United Company is Scratch Golf's parent company. McGlothlin is United Company's sole shareholder, has been the chairman of its board since the company was formed, and serves as the company's CEO. ECF No. 61-4, Deposition of James McGlothlin ("McGlothlin Depo.") 8:11–9:12. In or around July 2016,[1] Scratch Golf submitted an application to Beaufort County to rezone Hilton Head National. There were multiple, well-attended public meetings regarding the rezoning application, and according to Paul Sommerville ("Sommerville"), the chairman of the Beaufort City Council at the time, members of the public "overwhelmingly opposed the rezoning." ECF No. 61-6, Affidavit of Paul Sommerville ("Sommerville Aff.") ¶ 8. The Beaufort County Council ultimately denied the rezoning application on May 22, 2017.[2]

On May 12, 2017, an article about Hilton Head National was published on the website of The Island Packet, Hilton Head's local newspaper ("The Island Packet Article"). ECF No. 1-2. The Island Packet Article described the beginnings of Hilton

---

[1] The complaint alleges that the rezoning application was submitted in or around July 2016. Compl. ¶ 8. Neither party drew the court's attention to any evidence that confirms this date, and the court was unable to find any evidence of this date in the record. Contrary to the complaint's allegation, Paul Sommerville ("Sommerville"), the chairman of the Beaufort City Council at the time, recalled that the rezoning request was initiated in December 2016. ECF No. 61-6, Affidavit of Paul Sommerville ("Sommerville Aff.") ¶ 3. Nevertheless, as it appears that the parties do not dispute the date of the application and because it is not essential for the resolution of the parties' motions, the court will assume the date of the application was July 2016.

[2] Again, this date comes from the complaint, and there appears to be no evidence supporting the allegation. Nevertheless, the parties do not dispute the date nor does the specific date affect the court's consideration of the issues before it.

Head National and the decline of the golf course industry, which prompted its owners'

desire to rezone the property.  The article then discussed the proposed rezoning, which

included plans for 300 apartments, 300 homes, 500 hotel rooms, 400,000 square feet of

retail space, 125,000 square feet of office space, a 400-bed assisted living facility, a

1,500-seat performing arts center, a convention center, and a water park.  The article

contained quotes from Bill Palmer, the president of Scratch Golf, and Martin Kent

("Kent"), the president of the United Company.  McGlothlin was mentioned in the article,

described as "maintain[ing] a financial and personal interest in" Hilton Head National,

but not quoted.  Id. at 7.

On May 14, 2017, Hennelly commented on The Island Packet Article, stating:

> It looks like they left out a few pertinent facts.  The most glaring is the
> corrupt people involved.  This guy Kent was Chief of Staff to the corrupt
> Governor of Virginia.  he [sic] has never built a swing set never mind a
> 300m dollar city!!!  James Woodrow McGlothlin gave the corrupt Governor
> McDonald [sic] of Virginia [sic] wife a "no show" job.  The McDonalds
> [sic] never reported the income, $36,000.  These guys are crony capitalists
> and will break every rule in the book to get a government favor or handout.
> Let's vote NO to zoning change and send these carpetbaggers packing.
> Let's tell them loud and clear our elected officials are not for sale and are
> above reproach.  Let's support our honest elected officials and send these
> crooks back to Bristol[,] Virginia.

ECF No. 1-2 at 10.  Then on May 23, 2017, the day after the rezoning application was

denied, Hennelly posted, in relevant part, the following statement about the rezoning

issue on Facebook:

> The Island Packet gets an "incomplete" grade on their coverage of the issue.
> For some reason the [sic] refused to print the documented corruption of the
> owners of United Company.  Martin Kent and James McGlothlin were up
> to their eyeballs in the recent scandals in Virginia with the Governor and
> his wife.  McGlothlin gave the Governors [sic] wife a no show job at the
> heart of the ethical and criminal activity.

ECF No. 1-3 at 3.[3]  Hennelly explained that "[e]verything [he] posted was based off of information [he] had read in the newspaper articles."  ECF No. 61-7, Affidavit of Kevin Hennelly ("Hennelly Aff.")  ¶ 11.  Hennelly read multiple news articles about McGlothlin, including a Washington Post article entitled "Virginia governor's wife was paid $36,000 as consultant to coal philanthropy."  Id. ¶ 9.

That article reported that "Maureen McDonnell, the wife of Virginia's governor, was paid $36,000 last year to attend a handful of meetings as a consultant to the philanthropic arm of one of the state's major coal companies." ECF No. 61-7 at 7.  The "philanthropic arm" was the Frances G. and James W. McGlothlin Foundation, and Governor McDonnell reported on his annual financial disclosure forms that Mrs. McDonnell served as a paid trustee for the foundation.  However, the article reported, McGlothlin said that Mrs. McDonnell was paid by United Company, as opposed to by the foundation.

The article then explained that Virginia law requires elected officials to disclose any employer that pays their spouse more than $10,000 a year, and that if Governor McDonnell had indicated on his disclosure forms that Mrs. McDonnell was paid by United Company, the public could have concluded that Mrs. McDonnell made more than $10,000 annually.  Instead, by listing her position as a paid trustee, the governor did not have to provide any information about the amount of money she was paid.  The article noted that "[n]ews of this relationship comes as the FBI and Virginia State Police are

---

[3] Hennelly posted another Facebook post related to the rezoning, which was included in McGlothlin's complaint; however, because the court determined that it was not actionable defamation in a previous order, the court does not include it here.

exploring the McDonnells' finances" as part of a Virginia commonwealth attorney's review of Governor McDonnell's financial disclosures.

The article further reported that McGlothlin said that Mrs. McDonnell attended two or three board meetings and connected the foundation to notable people in Richmond who might want to attend charitable events.  The article then stated that "[f]or a few days of work, Maureen McDonnell picked up a salary nearly equivalent to the average starting pay of a Virginia teacher."  Id. at 8.  The article included a statement by McGlothlin that indicated that he and his wife discussed the idea of Mrs. McDonnell working with the foundation over a dinner with Governor McDonnell and Mrs. McDonnell and characterized the relationship between the McGlothlins and McDonnells as "close."  Id. at 11.  This information was also published in articles online by other new sources, including the Richmond Times-Dispatch; UP; the Roanoke Times; and WJLA, the ABC affiliate out of Washington, D.C., all of which Hennelly read.  Hennelly also read several articles about McGlothlin.  Hennelly Aff. ¶ 9.

McGlothlin filed this action on January 30, 2018, bringing claims for defamation, negligence/gross negligence/recklessness, and injunctive relief based on Hennelly's posts.[4]  Hennelly filed a motion to dismiss, which the court granted in part and denied in part.  ECF No. 38.  Specifically, the court dismissed McGlothlin's negligence claim and

---

[4] McGlothlin originally filed this action in federal court in the Middle District of Florida, where the case was dismissed for lack of personal jurisdiction.  McGlothlin then filed this action.

Moreover, Kent filed a defamation suit against Hennelly for the same comments. He originally filed suit in federal court in the Eastern District of Tennessee, where the suit was dismissed for lack of personal jurisdiction.  Kent appealed the dismissal to the Sixth Circuit Court of Appeals, voluntarily dismissed the appeal after briefing was completed, and filed suit in this court on May 10, 2019.  Kent v. Hennelly, 19-cv-01383-DCN.

held that several of Hennelly's allegedly defamatory statements were inactionable. Now, the only remaining allegedly defamatory statements are that McGlothlin, as owner of United, engaged in "documented corruption" related to the McDonnell scandal and that McGlothlin "gave the corrupt Governor McDonald [sic] of Virginia['s] wife a 'no show' job at the heart of the ethical and criminal activity." ECF No. 38 at 18.

On November 21, 2019, McGlothlin filed an unopposed motion for determination of dispositive motion deadline. ECF No. 60. On November 29, 2019, Hennelly filed his motion for summary judgment. ECF No. 61. McGlothlin responded on January 13, 2020, ECF No. 65, and Hennelly replied on January 30, 2020, ECF No. 70. McGlothlin filed a motion for partial summary judgment on December 1, 2019. ECF No. 62. Hennelly responded on January 15, 2020, ECF No. 67, and McGlothlin replied on February 3, 2020, ECF No. 71. The motions are all ripe for review.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."
Id.  "[A]t the summary judgment stage the judge's function is not himself to weigh the
evidence and determine the truth of the matter but to determine whether there is a
genuine issue for trial."  Id. at 249.  The court should view the evidence in the light most
favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

### III.  DISCUSSION

As an initial matter, the court finds McGlothlin's motion for a deadline for
dispositive motions to be moot, as both parties have filed dispositive motions.  While
McGlothlin's motion seeks partial summary judgment and only addresses the issue of
Hennelly's liability for McGlothlin's defamation claim, there is no need for McGlothlin
to file another motion for partial summary judgment on the issue of damages because the
court finds that summary judgment in favor of Hennelly is warranted.

Before diving into the parties' substantive arguments, the court first addresses an
evidentiary issue raised by McGlothlin.  In arguing that McGlothlin is a public figure and
a limited-purpose public figure, Hennelly relies heavily upon news articles.  In response,
McGlothlin notes that while the court may consider these articles in its public figure
analysis, the court may not consider the substance of the articles because they are
inadmissible hearsay.  ECF No. 65 at 2 n.1.  McGlothlin also states that Hennelly failed
to present most of these articles to McGlothlin during McGlothlin's deposition for
authentication purposes and argues that unauthenticated articles should not be considered
by the court.  In response, Hennelly argues that most of the articles are not hearsay
because they are not offered for the truth of the matter asserted but instead to show that
McGlothlin has access to channels of communication.  Hennelly also argues that several

7

of the articles are admissible because they either contain statements by McGlothlin, admissible as party-opponent statements, or because they are verified by McGlothlin's corroborating testimony or discovery responses.  Finally, Hennelly notes that courts routinely consider news articles in determining whether a plaintiff is a public figure.

The parties seem to agree that the court can consider news articles for the purpose of determining whether McGlothlin is a public figure.  To the extent the court considers the substance of a news article, the court will first determine whether the substance of the article is admissible and can be considered by the court.

Now the court turns to the substantive arguments raised by the parties' motions. Because there is overlap in the issues raised by the parties in their respective motions for summary judgment, the court will discuss the two motions and the issues that they raise together.  Hennelly seeks summary judgment, arguing that (1) McGlothlin is both a general public figure and a limited-purpose public figure; (2) McGlothlin cannot prove actual malice or common law malice; and (3) McGlothlin cannot prove the falsity of his statements.  McGlothlin seeks partial summary judgment on Hennelly's liability for defamation.  He argues that all of the necessary elements of a defamation action in South Carolina have been established; that McGlothlin is a private figure; and that even if the court finds McGlothlin to be a public figure, Hennelly acted with actual malice.

 "It is well established that tort liability under state law, even in the context of litigation between private parties, is circumscribed by the First Amendment."  Snyder v. Phelps, 580 F.3d 206, 217 (4th Cir. 2009), aff'd, 562 U.S. 443 (2011).  As such, the court first considers the relevant First Amendment principles to determine what, if any, constitutional limitations are imposed upon McGlothlin's defamation claim.  The court

then turns to its consideration of the elements of a South Carolina defamation claim.  The court finds that McGlothlin is a private figure, meaning he does not have to prove actual malice to recover for defamation, but that summary judgment in favor of Hennelly is warranted because based on the evidence cited, no reasonable jury could find that Hennelly acted with common law malice.

## A.  First Amendment Considerations

The court must first determine whether McGlothlin is a public figure, sometimes referred to as a general-purpose public figure; a limited-purpose public figure; or a private figure.  This determination dictates whether McGlothlin must show that Hennelly made his statements with actual malice, as public figures may only recover for defamation upon a showing of actual malice.  Tharp v. Media Gen., Inc., 987 F. Supp. 2d 673, 679 (D.S.C. 2013).  "[T]he issue of whether the plaintiff is a public figure is a question of law for the court."  Fitzgerald v. Penthouse Int'l, Ltd., 691 F.2d 666, 669 (4th Cir. 1982).  Deciding whether a particular plaintiff is a public or private figure has been described as "much like trying to nail a jellyfish to the wall."  Rosanova v. Playboy Enters., 411 F. Supp. 440, 443 (S.D. Ga.1976).  Determining whether McGlothlin is a public figure requires the court to "look through the eyes of a reasonable person at the facts taken as a whole."  Foretich v. Capital Cities/ABC, Inc., 37 F.3d 1541, 1551 (4th Cir. 1994) (quotations omitted).

### a.  General-Purpose Public Figure

Hennelly first argues that McGlothlin is a general-purpose public figure because he has extensive access to channels of effective communication and because he has invited attention and comment by virtue of his business, political, and charitable

activities. In response, McGlothlin argues that he has not attained the general notoriety in the community at issue here, Beaufort, South Carolina, to be considered a general-purpose public figure.

To determine whether a plaintiff is a general-purpose public figure, courts focus on two considerations. The first is whether the plaintiff "enjoy[s] significantly greater access to the channels of effective communication and hence ha[s] a more realistic opportunity to counteract false statements than private individuals normally enjoy." Gertz v. Robert Welch, Inc., 418 U.S. 323, 344 (1974). The second, and more important, consideration is that public figures "have assumed roles of especial prominence in the affairs of society" and therefore "invite attention and comment." Id. However, Gertz cautions that "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." Id. at 352; see also Blue Ridge Bank v. Veribanc, Inc., 866 F.2d 681, 687 (4th Cir. 1989) ("The attainment of general public figure status is not to be lightly assumed, even if the plaintiff is involved in community affairs, and requires clear evidence of such stature."). Indeed, "[f]ew people . . . attain the general notoriety that would make them public figures for all purposes." Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1296 (D.C. Cir. 1980); see also Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 165 (1979) (explaining that only a "small group of individuals who" occupy "a position of such 'persuasive power and influence'" are general purpose public figures."). And as McGlothlin points out, the public figure inquiry focuses on the plaintiff's notoriety in the community where the alleged defamation was published. See Gertz, 418 U.S. at 352 (requiring "general fame or

notoriety in the community"); <u>Waldbaum</u>, 627 F.2d at 1295 n.22 (concluding "that nationwide fame is not required.  Rather, the question is whether the individual had achieved the necessary degree of notoriety where he was defamed i.e., where the defamation was published").

     The court finds that Hennelly has failed to demonstrate that McGlothlin is a general-purpose public figure.  To show that McGlothlin is a general-purpose public figure, Hennelly cites to a plethora of evidence, including interviews of McGlothlin that have appeared in various media outlets, speeches that McGlothlin has given, McGlothlin's charitable activities, and McGlothlin's political involvement.  ECF No. 61-1 at 10–12.  Hennelly also argues that McGlothlin "actively courted" public attention "year after year" by appearing on the covers of several magazines and by attracting the attention of the press through his business, political, and charitable activities.  ECF No. 61-1 at 13.  Hennelly cites to various articles that discuss McGlothlin's leadership of the United Company, McGlothin's political activity that, while not limited to, has primarily been focused in Virginia, and various donations made by McGlothlin that have resulted in many buildings at Virginia universities and colleges named after McGlothlin.

     Based on the evidence presented to the court, the court is not convinced that McGlothlin has "the widespread power or pervasive influence necessary to affect the resolution of public issues in a manner which elevates [him] to a general-purpose public figure."  <u>Blue Ridge Bank</u>, 866 F.2d at 687.  While the evidence cited by Hennelly certainly indicates that McGlothlin is active in various aspects of public life, the court finds that he does not rise to the level of notoriety required to be a general-purpose public figure.  <u>Tavoulareas v. Piro</u>, 817 F.2d 762, 772 (D.C. Cir. 1987) (finding the plaintiff to

be "a highly prominent individual, especially in business circles, but his celebrity in society at large does not approach that of a well-known athlete or entertainer—apparently the archetypes of the general-purpose public figure"). As such, the court finds that McGlothlin is not a general-purpose public figure in Beaufort County, South Carolina.

### b.  Limited-Purpose Public Figure

Hennelly alternatively argues that McGlothlin is a limited-purpose public figure both for the purpose of the public controversy over the rezoning of Hilton Head National and for the purpose of comment on the controversy surrounding the McDonnells (the "McDonnell scandal").[5]  In response, McGlothlin argues that he is not a limited-purpose public figure with respect to the Hilton Head National rezoning by summarily denying that four of the five factors discussed below are met.  As for the McDonnell scandal, McGlothlin argues that the allegedly defamatory statements at issue here involve the dispute over the Hilton Head National rezoning and that Hennelly improperly conflates the two public controversies.

The Fourth Circuit uses the following five-part test that, if satisfied, establishes that a person is a limited-purpose public figure:

> (1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation.

---

[5] To provide some context, Governor McDonnell was convicted of public corruption after he left office, and his conviction was subsequently overturned by the United States Supreme Court.  The Washington Post article that Hennelly read was published prior to the former governor's conviction, and Hennelly read the article after the former governor's conviction had been overturned.

<u>Fitzgerald v. Penthouse Int'l, Ltd.</u>, 691 F.2d 666, 668 (4th Cir. 1982).  The court first considers the Hilton Head National rezoning and then considers the McDonnell scandal.

### i.  Hilton Head National

The court has already held that the rezoning of Hilton Head National is an issue of public concern, <u>McGlothlin v. Hennelly</u>, 370 F. Supp. 3d 603, 616 (D.S.C. 2019), and McGlothlin does not dispute that the issue is a public controversy for the purposes of the limited-purpose public figure test.  Therefore, the court begins its analysis the second and third factors, which the Fourth Circuit calls "[t]he heart of five-factor test."  <u>Carr v. Forbes, Inc.</u>, 259 F.3d 273, 280 (4th Cir. 2001).  The Fourth Circuit "sometimes combine[s]" these two factors "into the question of 'whether the plaintiff has voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy.'"  <u>Id.</u> (quoting <u>Reuber v. Food Chem. News, Inc.</u>, 925 F.2d 703, 709 (4th Cir. 1991)).  As such, the question is whether McGlothlin voluntarily assumed a role of special prominence in the Hilton Head rezoning by attempting to influence the outcome of the rezoning.

Hennelly argues that this case is factually indistinguishable from <u>Carr</u>, in which the Fourth Circuit found that the plaintiff was a limited-purpose public figure.  In <u>Carr</u>, the plaintiff, Carr, was the president and CEO of a company called Interwest Management, Inc. ("Interwest"), which developed public infrastructure projects with public-private financing methods and was controlled by another company called DLR. 259 F.3d at 275.  In 1991, Interwest contracted with officials in Apache Junction, Arizona to build a sewer system.  However, the project was unsuccessful.  Interwest "apparently relied on unreasonably optimistic projections and an erroneous database of potential

13

customers," which caused the project to fail. Id. at 276. The project was financed by bonds issued by Allstate Insurance Company, and Allstate sued all members of Interwest for fraud.

In July 1995, South Carolina officials solicited bids to build the Southern Connector, a highway that would connect I-85 with I-385 in Greenville County. Interwest created a new corporation, Interwest Carolina, LLP, to bid on the project, and Interwest Carolina won the bid. Interwest Carolina was also controlled by DLR, and Carr has no ownership stake in the company. Nevertheless, Carr served as the project manager and behind-the-scenes facilitator. The Southern Connector project quickly became controversial—opponents of the project claimed that the project required a local referendum and filed suit, and state officials became concerned about Interwest Carolina's honesty and competency after they learned of Allstate's fraud suit against Interwest. In the midst of these controversies, Forbes magazine published an article about Carr that suggested he was "a shady businessman with a troubled history." Id. at 277. The article spoke negatively about Carr as well as the Apache Junction project and the Southern Connector project. As a result of the article, DLR fired Carr, and Carr filed a defamation suit against Forbes.

In considering whether Carr was a limited-purpose public figure, the Fourth Circuit focused its attention on the combination of the second and third factors of its test, asking "whether the plaintiff has voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy." Id. at 280. The Fourth Circuit concluded that Carr did. First, the court explained Carr's significant involvement in the two projects, which was the public controversy at issue.

The Fourth Circuit noted that while Carr did not own Interwest, "the company was his brain-child" and he was the president and CEO.  Id.  The court explained that Carr "was, for all intents and purposes, solely in charge of the company's activities" because he hired employees, selected the company's projects and planned their operations, and put together the company's deals.  Id.  Carr also made the decisions of Interwest's development of Apache Junction and "played a critical role" in forming Interwest Carolina and supervising the Southern Connector project.  Id.

The Fourth Circuit also found that Carr "voluntarily injected himself into the public debate" because Carr attended public meetings, spoke out in favor of the Apache Junction project, wrote editorials in the local press, and was quoted in local media.  Id. at 281.  And while Carr's role in South Carolina was not quite as public, "it [was] uncontroverted that, at least behind the scenes, he managed the Southern Connector project in much the same way as he had managed the Apache Junction project."  Id.  Carr negotiated with South Carolina public officials, was instrumental in creating the Southern Connector bid, and played a dominate role in building the Interwest Carolina team.  As such, the Fourth Circuit concluded that "[i]f not the only force behind the project in South Carolina, Carr was clearly a strong and influential one."  Id.  Considering all of these facts together, the Fourth Circuit held that Carr's "acts created much of the controversy discussed in the [Forbes] article, and he voluntarily injected himself into much of the public imbroglio surrounding these projects."  Id.

Here, McGlothlin is United Company's sole shareholder, has been the chairman of its board since the company was formed, and serves as the company's CEO.  McGlothlin Depo. 8:11–9:12.  United Company is the parent company of Scratch Golf,

which is the company that submitted the rezoning application for Hilton Head National. In terms of McGlothlin's involvement with Hilton Head National and the rezoning application, McGlothlin admitted that he was involved in the decision to try to rezone Hilton Head National, but he also stated that he was not involved in the rezoning application nor did he approve the application. McGlothlin Depo. 99:12–16; 102:1–6. Indeed, The Island Packet article noted that "[w]hile McGlothlin maintains a financial and personal interest in the [golf] course—Hilton Head National was the first golf course he was involved in developing—the daily operations and decision-making related to the proposed redevelopment fell to [Martin] Kent[, the president of United Company,] and [Bill] Palmer[, the president of Scratch Golf]." ECF No. 1-2 at 7.

Moreover, McGlothlin did not attend any meetings about the rezoning in Beaufort County. McGlothlin Depo. 99:6–8. McGlothlin called Sommerville in May 2017 and "expressed the hope" that Sommerville would support the request for rezoning, Sommerville Aff. ¶¶ 2, 4–5, but this was the only time McGlothlin spoke to Mr. Sommerville about the rezoning application. McGlothlin Depo. 98:16–22. In addition, there is no evidence in the record that McGlothlin was ever quoted in the media about the rezoning during the controversy or published any editorials or the like about the issue.

The court finds these facts to be dissimilar from those in Carr. While Carr and McGlothlin held the same or similar positions in their respective companies, Carr was much more involved in the day-to-day operations of the projects at issue—Carr planned the Apache Junction project and served as the project manager for the Southern Connector project. Here, McGlothlin was not involved in the rezoning application. While McGlothlin did reach out to a public official to garner support for the rezoning, he

only did so once, compared to Carr's multiple negotiations with South Carolina public officials. Another point of contrast is that McGlothlin did not attend any meetings in Beaufort County, and there is no evidence in the record to suggest that he ever published any editorials or the like, while Carr attended local meetings about the Apache Junction project, wrote editorials in the local press, and spoke out in favor of the project. While Carr's involvement in the Southern Connector project was behind the scenes, as Hennelly argues McGlothlin's involvement was here, the Fourth Circuit also considered Carr's very public involvement in the Apache Junction project to conclude that he was a limited-purpose public figure. As such, the court is unconvinced that behind-the-scenes involvement alone is sufficient to find that a person is a limited-public purpose figure, especially when the relevant inquiry is whether the person "thrust[ed] himself into the forefront of public debate." Carr, 259 F.3d at 278.

In sum, while McGlothlin clearly had some involvement in the Hilton Head National rezoning, the evidence before the court does not show that he "voluntarily injected himself into much of the public imbroglio surrounding" the controversy. See id. at 281. Having found that the second and third factors of the five-part test are not met here, the court declines to consider the other factors and finds that McGlothlin is not a limited-purpose public figure for the purpose of the Hilton Head rezoning.

### ii.  McDonnell Scandal

Hennelly also argues that McGlothlin is a limited-purpose public figure for purposes of the McDonnell scandal. Hennelly explains that while his comments primarily addressed the Hilton Head National rezoning, they also referenced the McDonnell scandal. Hennelly argues that an individual who associates himself with a

17

high-profile politician bears the risk of public comment on that relationship. In response, McGlothlin argues that the public controversy at issue is the Hilton Head National project, not the McDonnell scandal, and that because this litigation is focused on the Hilton Head National project, any public figure status based on the McDonnell scandal is improper.

In considering whether a person is a limited-purpose public figure, the court must first determine "whether a public controversy gave rise to the defamatory statement." Carr, 259 F.3d at 278.[6] That determination "requires review of the scope of the alleged defamatory statements and the facts surrounding them." Id. at 279. The Fourth Circuit has explained that "'public controversy' is a legal term of art; the term only encompasses a dispute 'that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.'" Id. (quoting Foretich, 37 F.3d at 1554). The parties do not seem to dispute that the McDonnell scandal is a public controversy; rather, they disagree over when the McDonnell scandal "gave rise to the defamatory statement."

The remaining allegedly defamatory statements in this action are that McGlothlin, as owner of United, engaged in "documented corruption" related to the McDonnell scandal and that McGlothlin "gave the corrupt Governor McDonald [sic] of Virginia['s] wife a 'no show' job." ECF No. 38 at 18. McGlothlin argues that "[o]nce that specific public controversy has been identified, the applicable defamatory statement must have been germane to the plaintiff's participation in it." ECF No. 65 at 7. In so arguing he

---

[6] The court did not address this step in its analysis of McGlothlin's limited-purpose public figure status as related to the Hilton Head National rezoning because the parties do not appear to dispute that the project was a "public controversy" that "gave rise to the defamatory statement."

18

relies on Waldbaum v. Fairchild Publications, Inc., which states that "the alleged defamation must have been germane to the plaintiff's participation in the controversy." 627 F.2d 1287, 1298 (D.C. Cir. 1980). However, this "germaneness" requirement is part of Waldbaum's three-part test to determine if a plaintiff is a limited-purpose public figure. See id. at 1298; see also Wells v. Liddy, 186 F.3d 505, 538 (4th Cir. 1999) (acknowledging hat the D.C. Circuit uses the three-part Waldbaum test, which includes considering whether the allegedly defamatory statement concerned the public controversy). As discussed above, the Fourth Circuit employs its own five-part test to determine if a plaintiff is a limited-purpose public figure. That test does not have a germaneness requirement that is comparable to Waldbaum's test. Indeed, the court has been unable to find any case within the Fourth Circuit that applies Waldbaum's germaneness requirement. As such, the court finds it inappropriate to consider this decision.

Returning to the relevant law of this circuit, the court must determine "whether a public controversy gave rise to the defamatory statement." Carr, 259 F.3d at 278. The controversy that caused Hennelly to make the statements he did was the Hilton Head National rezoning. Read in context, Hennelly's statements about the McDonnell scandal were to note that the Island Packet "left out a few pertinent facts" about the Hilton Head National controversy and to highlight the Island Packet's "refus[al] to print the documented corruption" and the fact that McGlothlin gave Governor McDonnell's wife a "no show job at the heart of the ethical and criminal activity." ECF No. 1-2; 1-3. However, Hennelly's statements themselves were about the McDonnell scandal. Therefore, the court finds it plausible to consider both the Hilton Head National project

and the McDonnell scandal to be public controversies that gave rise to Hennelly's allegedly defamatory statements.

Nevertheless, even assuming without deciding that the McDonnell scandal is the public controversy used to determine whether McGlothlin is a limited-purpose public figure, the court finds that McGlothlin is not a limited-purpose public figure in that context either.  Hennelly cites to news articles that discussed the job that McGlothlin gave Mrs. McDonnell, that identified McGlothlin as a potential defense witness in the criminal prosecution of Governor McDonnell, and that described McGlothlin as having a close relationship with the McDonnells.  However, focusing again on the heart of the Fourth Circuit's limited-purpose public figure test, this evidence does not show that McGlothlin voluntarily assumed a role of special prominence in the McDonnell scandal or that he sought to influence the resolution or outcome of the McDonnell scandal. Hennelly argues that McGlothlin's close association with the McDonnells warrants a limited-purpose public figure status, relying on Jankovic v. Int'l Crisis Grp. to argue that McGlothin's "close political relationship" with the McDonnells "carried a risk of public scrutiny."  822 F.3d 576, 587 (D.C. Cir. 2016).  However, in Jankovic, the plaintiff did not merely have "close political relationship" to the politician.  Instead, the evidence showed that "he was was [sic] an outspoken supporter, financial backer, and advisor" of the politician, he published articles in newspapers about the public controversy, and he "engaged in conduct that he knew markedly raised the chances that he would become embroiled in a public controversy."  Id.  Here, there is no evidence of McGlothlin inserting himself into or speaking out about the McDonnell scandal.  Instead, the evidence merely shows that McGlothlin had a relationship with the McDonnells.

20

Similarly, in the other case relied upon by Hennelly, the plaintiff was not a limited-purpose public figure merely because he went on "weekend trips" with an infamous motorcycle gang.  Marcone v. Penthouse Int'l Magazine For Men, 754 F.2d 1072, 1086 (3d Cir. 1985).  Instead, the Third Circuit found that the plaintiff was a limited-purpose public figure because the plaintiff's "voluntary connection with motorcycle gangs—including his meetings at the Castle with Frey and his occasional weekend trips with them—in conjunction with the intense media attention" warranted such a status.

In sum, even if the McDonnell scandal were to be considered as a public controversy for the purposes of the limited-purpose public figure analysis, the court finds that McGlothlin is not a limited-purpose public figure in the McDonnell scandal.  As such, McGlothlin is a private figure and need not prove actual malice to recover for defamation.

**B.  South Carolina Defamation Law**

Having determined that McGlothlin is a private figure, the court now turns to consider the elements of McGlothlin's South Carolina defamation claim.  McGlothlin argues that he has established each element of a South Carolina defamation action. Hennelly argues that summary judgment is warranted in his favor because McGlothlin cannot prove falsity and because McGlothlin cannot prove common malice.  In addition, in response to McGlothin's motion, Hennelly also argues that McGlothin's purported damages of $110,395,000.00 are unsupported by the record.

In order for a private plaintiff to bring a successful claim for defamation under South Carolina law, the plaintiff must prove: "(1) a false and defamatory statement was made; (2) the unprivileged publication of the statement was made to a third party; (3) the

21

publisher was at fault; and (4) either actionability of the statement regardless of special harm or the publication of the statement caused special harm." <u>Kunst v. Loree</u>, 817 S.E.2d 295, 302 (S.C. Ct. App. 2018), reh'g denied (Aug. 16, 2018). Several presumptions accompany these elements. First, common law generally presumes that the statement is false. <u>Holtzscheiter v. Thomson Newspapers, Inc.</u>, 506 S.E.2d 497, 506 (S.C. 1998). In addition, when a statement is actionable per se, the defendant is presumed to have acted with common law malice,[7] and the plaintiff is presumed to have suffered general damages. <u>Erickson v. Jones St. Publishers, LLC</u>, 629 S.E.2d 653, 664 (S.C. 2006). As the Supreme Court of South Carolina has explained, "libel is a written defamation" and "essentially all libel is actionable per se." <u>Id.</u> Therefore, in a defamation suit involving libel in which the plaintiff is a private figure, both common law malice and general damages are presumed.

However, there are three important caveats that apply when the allegedly defamatory statement relates to a matter of public concern. First, the presumptions of common law malice and general damages do not apply, and instead the plaintiff must prove both common law malice and actual damages. <u>Id.</u> at 665. Second, the presumption that the statement is false does not apply, and the plaintiff must prove that the statement is false. <u>Id.</u> Finally, the plaintiff cannot recover punitive damages unless he proves by clear and convincing evidence that the defendant acted with constitutional actual malice. <u>Id.</u>

---

[7] Common law malice, as opposed to negligence, is the standard of liability for private figure plaintiffs in South Carolina. <u>Floyd</u>, 2007 WL 4458924, at *3 n.3 (D.S.C. Dec. 17, 2007). The use of this standard has faced some criticism but nevertheless remains the law of South Carolina. <u>Id.</u>

Notably, the <u>Erickson</u> court discussed these caveats as applying to cases in which the defendant was part of the media. <u>Id.</u> It appears that South Carolina courts have not considered whether the caveats apply in the context of a nonmedia defendant. However, in describing these caveats, the <u>Erickson</u> court relies on federal law. <u>Id.</u> (citing <u>Gertz</u>, 418 U.S. at 346–50; <u>Philadelphia Newspapers, Inc. v. Hepps</u>, 475 U.S. 767, 775–79 (1986)). In <u>Snyder</u>, the Fourth Circuit found any distinction between media defendants and non-media defendants in defamation actions to be meaningless. 580 F.3d at 219 n.13. Therefore, the court finds that the caveats articulated in <u>Erickson</u> apply here, [8] where the defendant is not part of the media and there is no dispute that the matter at issue here is one of public concern. As such, in order to succeed on his defamation claim, McGlothlin must prove common law malice, actual damages, and that Hennelly's statements were false. <u>See</u> <u>Tharp</u>, 987 F. Supp. 2d at 681–82 ("[B]ecause Plaintiff is a private figure plaintiff and the alleged defamatory statements were of public concern, South Carolina state law requires the Plaintiff 'to plead and prove common law malice, demonstrate the falsity of the statements, and show actual injury in the form of general or special damages.'" (quoting <u>Floyd</u>, 2007 WL 4458924, at *3)). The court finds that no reasonable jury could find that Hennelly acted with common law malice and declines to address whether McGlothlin suffered actual damages and whether Hennelly's statements were false.

---

[8] Hennelly clearly agrees with this position. ECF No. 61-1 at 42 n.132. With regard to McGlothlin's position, he agrees that he must prove common law malice and actual damages. ECF No. 62-1 at 8–9; ECF No. 71 at 4–5. He never discusses which party bears the burden of proving falsity; however, it would be illogical and a distinction without meaning for McGlothlin to claim that only two of the three caveats apply here.

Common law malice is a concept that is distinct from actual malice. Hainer v. Am. Med. Int'l, Inc., 492 S.E.2d 103, 106 n.7 (S.C. 1997). Actual malice means "that the defendant made the statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" Reuber v. Food Chem. News, Inc., 925 F.2d 703, 714 (4th Cir. 1991) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964)). Common law malice "can mean the defendant acted recklessly or wantonly, or with conscious disregard of the plaintiff's rights." Hainer, 492 S.E.2d at 107. The term "has also been defined as meaning 'the defendant was actuated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff; or that the statements were published with such recklessness as to show a conscious indifference towards plaintiff's rights.'" Id. (quoting Jones v. Garner, 158 S.E.2d 909, 914 (S.C. 1968)). "Whether malice is the incentive for a publication is ordinarily for the jury to decide." Murray v. Holnam, Inc., 542 S.E.2d 743, 751 (S.C. Ct. App. 2001). "Proof that statements were published in an improper and unjustified manner is sufficient evidence to submit the issue of actual malice to a jury." Id.

As an initial matter, Hennelly argues that McGlothlin's failure to discuss or even mention the issue of common law malice in his motion for summary judgment is fatal to his motion. Hennelly notes that McGlothlin addresses constitutional actual malice, but that the two standards are distinct, meaning discussion of one does not constitute discussion of the other. In response, McGlothlin claims that he "made reference, and cited authority related to the necessary components of malice, including common law malice" in his motion and in his response to Hennelly's motion, citing to those portions. ECF No. 71 at 4 n.2 (citing ECF No. 62 at 9–10 and ECF No. 65 at 8 n.4).

24

Turning first to McGlothlin's motion, McGlothlin cites to pages 9 and 10 for his discussion of common law malice. However, that portion of his motion is titled "The Defendant made his false and defamatory statements with actual malice" and only discusses constitutional actual malice. ECF No. 62-1 at 9–10. Indeed, the term "common law malice" does not appear at all in McGlothlin's motion for summary judgment.

In the portion McGlothlin cites to within his response to Hennelly's motion, which is just one footnote, McGlothlin stated that "[t]he burden of establishing actual malice is much higher than common law malice. Holtzscheiter v. Thomson Newspapers, Inc., 506 S.E.2d 497, [503] n.9 (S.C. 1998). Since the Defendant acted with actual malice when he made the false and defamatory statements at issue, a discussion on common law malice here is moot." ECF No. 65 at 8 n.4. This statement of law is not quite accurate. As the magistrate judge in Fields v. Richland Cty. Sheriff's Dep't explained:

> In other words, common law actual malice is more broadly defined than the actual malice used in New York Times and, thus, actions that fall within the New York Times definition, i.e., that the defendant made a statement with reckless disregard of its falsity, also fall within the common law actual malice definition, i.e., that the defendant's actions were reckless or wanton and consciously indifferent to plaintiff's rights, but not necessarily vice versa.

2018 WL 4560538, at *6 (D.S.C. May 25, 2018), report and recommendation adopted, 2018 WL 4001830 (D.S.C. Aug. 22, 2018). In other words, there is overlap between constitutional actual malice and common law malice: recklessness. Moreover, there are two definitions of common law malice: recklessness or acting with ill will. Hainer, 492 S.E.2d at 107. While there is overlap with regard to recklessness, the Supreme Court has

25

cautioned that "[a]ctual malice under the <u>New York Times</u> standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." <u>Masson v. New Yorker Magazine, Inc.,</u> 501 U.S. 496, 510 (1991). Therefore, to the extent a plaintiff seeks to prove common law malice by showing that "the defendant was actuated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff," <u>see</u> <u>Hainer</u>, 492 S.E.2d at 107, that plaintiff cannot rely on constitutional actual malice.

In light of the "recklessness" overlap between the two types of malice, the court looks to McGlothlin's argument about recklessness in his discussion of constitutional actual malice to analyze any argument about common law malice. McGlothlin does, albeit very briefly, argue that Hennelly acted with reckless disregard for the truth.[9] In a footnote in his motion for summary judgment, McGlothin argues, without citation to any evidence, that "even circumstantial evidence that the Defendant took no steps to insure [sic] the accuracy and correctness of internet research has been previously found by this Court to be sufficient to show reckless disregard for the truth." ECF No. 62-1 at 10 n.1. In so arguing, McGlothlin relies on <u>Floyd v. WBTW</u>, 2007 WL 4458924 (D.S.C. Dec. 17, 2007). In <u>Floyd</u>, the defendant news station ran a story in which it reported that the plaintiff's medical license had been suspended due to addiction to alcohol or drugs. 2007 WL 4458924 at *1. The defendants submitted affidavits to show that the incorrect news story was the result of a simple transcription error, and there was circumstantial evidence

---

[9] McGlothin's argument about actual malice focuses primarily on the alternative definition of actual malice: knowledge of falsity. However, McGlothin makes no argument nor provides any legal authority to suggest that a showing of knowledge of falsity constitutes common law malice under South Carolina law.

that no precautionary measures were in place to protect again this type of reporting error. As such, the court concluded that "[b]ecause there is circumstantial evidence that Defendants took no steps to ensure the web story's accuracy or correctness, a reasonable juror might conclude that Defendants published the statement concerning Plaintiff with reckless disregard for the truth." Id. at *4.

That is not what happened here. As Hennelly points out, the uncontroverted evidence shows that Hennelly made his statements because of his research, not in spite of failing to conduct research to ensure his statements' accuracy. Hennelly researched McGlothlin and read a number of articles about McGlothlin prior to making his statements. Hennelly Depo. 49:11–16. Hennelly explained that "[t]here were numerous statements in many of those articles relating to this particular problem, which was an ethic's [sic] violation, as [he] understood the articles, in the State of Virginia. And there were several people involved with that ethic's [sic] violation." Henelly Depo. 50:13–18. Moreover, in his affidavit, Hennelly attested to the following:

> I viewed these newspapers as credible sources, especially the Washington Post. I had relied on these newspapers as sources of information in the past. I had no reason to doubt the veracity of the information I read nor the accuracy of the statements that I posted. Indeed, all of my comments were based on evidence I believed to be truthful.

Hennelly Aff. ¶ 14. Not only does McGlothlin fail to point to any "circumstantial evidence that the [Hennelly] took no steps to [ensure] the accuracy and correctness of internet research," ECF No. 62-1 at 10 n.1, but the evidence presented to the court indicates just the opposite—that Hennelly researched McGlothlin, read multiple newspaper articles about the issues, and had no reason to doubt the veracity of the

information he read.[10]  As such, McGlothin's reliance on <u>Floyd</u> is misplaced, and in combination with his failure to cite to any evidence, the court concludes that no reasonable jury could find that Hennelly's actions were reckless.

Turning to McGlothin's explicit common law malice argument, McGlothlin fails to present any argument in his motion for summary judgment as to common law malice; however, he does make an argument about common law malice in his reply brief.  The court generally declines to consider arguments raised for the first time in a reply brief. Local Rule 7.07 permits the filing of a reply when "a party desir[es] to reply to <u>matters raised initially in a response to a motion</u>."  Local Civ. Rule 7.07 (D.S.C.) (emphasis added); <u>see also</u> <u>Allen v. Enabling Techs. Corp.</u>, 2016 WL 4240074, at *4 (D. Md. Aug. 11, 2016) ("The purpose of a reply is to address counter-points made in an opposition.  In general, a reply memorandum should be focused, direct, and include no new argument." (internal citation omitted)).  Nevertheless, because the court prefers to resolve issues on their merits as opposed to based on default, the court will consider McGlothlin's argument about common law malice made in his reply brief.

McGlothlin argues that, based on excerpts from Hennelly's deposition, Hennelly clearly understood the gravity of falsely accusing someone of committing a crime or ethical violation but did not hesitate to accuse McGlothlin of both, evincing ill will, recklessness, and/or conscious indifference to McGlothlin's rights.  McGlothlin points to a portion of Hennelly's deposition in which Hennelly was asked if he would "agree that calling people corrupt might damage those people's reputation," Hennelly responded "[n]ot necessarily."  Hennelly Depo. 54:19–21.  It's not clear to the court how Hennelly's

---

[10] In other words, Hennelly did not rely on "fake news."

disagreement on whether calling someone corrupt might damage their reputation evinces ill will or reckless or conscious disregard to McGlothin's rights. If Hennelly had agreed that calling someone corrupt does damage a person's reputation and then admitted to calling McGlothlin corrupt, that could possibly show that Hennelly's statement was made with ill will, recklessness, or conscious disregard to McGlothlin's rights. But the fact that Hennelly does not believe that calling someone corrupt necessarily damages a person's reputation suggests the opposite of what McGlothlin must prove to show common law malice.

> McGlothlin also relies on the following exchange to show common law malice:
>
> Q: So you'd be okay with people stating that you're a criminal in a public forum?
> A: No.
> Q: Why not?
> A: It's not true.
> . . .
> Q: And, as discussed multiple times, you had no information that would lead you to believe that either [Mr. McGlothlin] or [Mr. Kent] had ever been convicted of a crime?
> A: I answered that question, yeah.

Hennelly Depo. 70:1–5; 14–18. Again, the court is not clear how this is evidence of Hennelly acting with ill will, recklessly, or with conscious disregard to McGlothlin's rights. Hennelly never stated that McGlothlin was convicted of a crime,[11] so the fact that Hennelly had no information that led him to believe that McGlothlin was convicted of a crime is irrelevant. Finally, McGlothlin notes in a footnote that "[m]any of the Defendant's responses during his deposition pushed the bounds of credulity." ECF No.

---

[11] The only reference to crime in Hennelly's statements is that "McGlothlin gave the Governors [sic] wife a no show job at the heart of the ethical and criminal activity." ECF No. 1-3 at 3. No reasonable juror could understand this statement to mean that McGlothlin had been <u>convicted</u> of a crime.

71 at 5.  However, the court cannot make credibility determinations during its consideration of motions for summary judgment.  <u>Jacobs v. N.C. Admin. Office of the Courts</u>, 780 F.3d 562, 569 (4th Cir. 2015).  Therefore, whether Hennelly's deposition testimony "pushed the bounds of credulity" plays no role in the court's analysis.

This evidence is the only evidence that McGlothlin cites to show that Hennelly acted with common law malice.  The Federal Rules of Civil Procedure provide that when considering a motion for summary judgment, "[t]he court need consider only the cited materials."  Fed. R. Civ. P. 56(c)(3).  Moreover, as the Fourth Circuit has explained, judges "are not like pigs, hunting for truffles buried in briefs.  Similarly, it is not our job to wade through the record and make arguments for either party."  <u>Hensley on behalf of N. Carolina v. Price</u>, 876 F.3d 573, 581 (4th Cir. 2017).  Based on the evidence and arguments presented to the court, no reasonable jury could find that Hennelly acted with common law malice.  As such, there is no genuine issue of material fact as to this element, and summary judgment is warranted in favor of Hennelly.[12]

---

[12] Because summary judgment is warranted in favor of Hennelly on McGlothlin's defamation claim, summary judgment is also warranted on McGlothlin's claim seeking injunctive relief.  That claim asks the court to permanently enjoin Hennelly from making any more defamatory statements, and having found that McGlothlin's defamation claim fails, any injunctive relief for any future defamatory statements would be based on pure conjecture.

## IV.   CONCLUSION

For the reasons set forth above, the court **FIND AS MOOT** the motion for determination of a dispositive motion deadline, **GRANTS** Hennelly's motion for summary judgment, and **DENIES** McGlothlin's motion for partial summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**April 15, 2020**
**Charleston, South Carolina**